Filed 9/22/21  In re Z.K. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re Z.K., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B310112 (Super. Ct. No. 19JV00320) (Santa Barbara County) |
| SANTA BARBARA COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v. S.K., Defendant and Appellant. | |

S.K. (mother) appeals the juvenile court's order terminating parental rights to her son, Z.K.  (Welf. & Inst. Code, § 366.26.)[1]  She contends the court lacked substantial evidence to

---

[1] All statutory references are to the Welfare and Institutions Code.

support its ruling because it failed to ascertain the wishes of Z.K. about his impending adoption.  We affirm.

FACTS AND PROCEDURAL BACKGROUND

Santa Barbara County Child Welfare Services (CWS) detained then-eight-year-old Z.K. in August of 2019 after police discovered his father operating a butane honey oil lab[2] in their home's backyard.  Z.K.'s maternal great aunt and uncle took the boy into their home three days later.  The juvenile court declared Z.K. a dependent of the court in September and continued placement with his aunt and uncle.  It ordered his parents to participate in reunification services, including parenting education courses and substance abuse treatment.

Mother and father participated minimally in these services. CWS could not contact father at all during the first review period. Mother met with child welfare workers intermittently but tested positive for methamphetamine.  At the six-month status review hearing, the parties submitted on CWS's recommendation that Z.K. remain in placement while his parents received more time to complete reunification services.

Father eventually contacted CWS by phone but failed to complete a drug screen or enter treatment before the twelve-month status review.  Mother entered inpatient treatment but left after one day.  She opted to remain homeless and refused offers to help arrange outpatient treatment and transportation. Neither parent communicated regularly with CWS about their progress.

---

[2] "Honey oil" is a term for concentrated marijuana extract packaged in vapor cartridges.  Black market producers commonly draw out the substance from cannabis with butane, a highly combustible gas used to fuel barbecues and cigarette lighters.

2

The juvenile court terminated reunification services at the twelve-month review and scheduled a section 366.26 hearing. Mother contested CWS's recommendation to terminate parental rights and to select adoption as Z.K.'s permanent plan. She later decided not to file an offer of proof after consulting with counsel in advance of the pretrial conference. The juvenile court adopted CWS's recommendation. Mother timely appealed.

DISCUSSION

### A. Substantial Evidence Supports the Juvenile Court's Adoptability Finding

Mother appeals the juvenile court's finding that Z.K. is adoptable under subdivision (c) of section 366.26.[3] She contends the juvenile court failed to "consider the wishes of the child" when it selected adoption as his permanent plan. (§ 366.26, subd. (h).) The argument is misplaced. Adoptability is based on a child's age, physical condition, and other characteristics that typically determine whether the child welfare agency will find adoptive parents within a reasonable time. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) A child's willingness to submit to adoption is not among these. (*Id.* at pp. 1649-1650 ["Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor"];

---

[3] Mother did not object to the adoptability finding during the juvenile court proceedings. Nevertheless, we agree she may challenge this aspect of the judgment for the first time on appeal. (See *In re Brian P.* (2002) 99 Cal.App.4th 616, 623 [when the merits are contested, parent was not required to object to the social service agency's failure to carry its burden of proof on the question of adoptability].)

*In re Jose C.* (2010) 188 Cal.App.4th 147, 158 [rejecting argument that child's willingness "'to accept and submit to an adoption'" should be a factor in determining whether child is likely to be adopted].)

Reports prepared by CWS and Z.K.'s special advocate confirm the boy's aunt and uncle consistently expressed their desire to adopt him if his parents did not complete reunification services. This alone was clear and convincing evidence of his adoptability. (See *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527 [absent evidence of legal impediment, "foster parents' interest in adopting I.W. is sufficient to support the juvenile court's finding of general adoptability"], disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010.)

*B. The Juvenile Court Adequately Considered Z.K.'s Wishes*

Mother argues Z.K.'s wishes about adoption were not considered by the juvenile court. She waived the issue when she did not raise it below. (See *In re Jose C.*, *supra*, 188 Cal.App.4th at p. 161 ["parties cannot assert error on appeal when they failed to raise the issue with the juvenile court"].) Were it not waived, we would still affirm.

Mother's argument derives from the court-appointed advocate's concern about how Z.K. still believed his placement was temporary because mother visited regularly. The advocate's 366.26 report recommended "counseling or therapy to help him with his emotions and the reality that he will live permanently with [his aunt and uncle]." Mother characterizes these sentiments as showing caregivers and child welfare workers kept Z.K. in the dark about their plans for him. This resulted in the juvenile court "foisting" adoption on an older child who might have objected to the decision if he were fully apprised of its legal

4

ramifications, i.e., the "severing ***all ties*** to the people he cared about."

One must view the advocate's statement in context with the record before the juvenile court. Despite her concern, the advocate still recommended "parental rights be terminated, and adoption be the permanent plan for [Z.K.]." Her report confirmed Z.K. would continue to receive counseling and therapy to learn coping skills and treat trauma. CWS's 366.26 report stated his aunt and uncle had recently broached the topic of adoption and would "utilize a therapist to help him process his feelings" on the subject. They remained open to continued contact with mother after adoption. In the meantime, Z.K. told his CWS case worker he felt good about staying in the home permanently and did not have worries or concerns about it. We find nothing in the record indicating the juvenile court gave short shrift to Z.K.'s wishes or tacitly permitted case workers to mislead him about the trajectory of his placement.

### C. The Juvenile Court Need Not Have Considered Legal Guardianship as an Alternative to Adoption

Mother contends the juvenile court should have considered legal guardianship because it would have provided Z.K. structure and stability without the "future trauma" adoption would cause. Again, she waived the issue by not raising it below. And again, we would reject the argument had she raised it.

The "trauma" described by mother is her paraphrasing of the CASA advocate's above-mentioned caveat about Z.K.'s potential reaction to his adoption. The juvenile court stated it read and considered this report. Mother identifies no other evidence suggesting legal guardianship would provide Z.K. with a healthier or stabler home environment. (See *In re Helen W.*

(2007) 150 Cal.App.4th 71, 80 ["[a]fter a child is found adoptable, the termination of parental rights and adoption is considered the best mechanism to ensure the child has 'a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child'"].)  In addition, CWS's 366.26 report confirmed Z.K.'s aunt and uncle preferred adoption over guardianship.

### D. The Beneficial Relationship Exception
### Does Not Apply to This Appeal

We granted Mother's request to supplement her briefing to address *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), which addressed the "beneficial relationship exception"[4] to the general rule favoring adoption as a minor's permanent plan when parental reunification services are terminated.  (§ 366.26, subd. (c)(1)(B).)  The exception applies when terminating parental rights "would be detrimental to the child."  (*Ibid.*)  Parents must show they have maintained regular visitation and contact with the child and *the child would benefit from continuing the relationship*."  (§ 366.26, subd. (c)(1)(B)(i), italics added.)

We find no occasion to visit *Caden C.* where, as here, neither parent invoked the beneficial relationship exception during permanency proceedings.  Entertaining the exception in these circumstances would require us to engage in the "subtle enterprise" of severing the relationship between natural parents and their children.  (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)  The juvenile courts are best positioned to weigh the benefits of maintaining this relationship against those placing the child in

---

[4] Alternate labels for the exception include "parental-benefit exception" and "beneficial parental relationship exception."

an adoptive home.  We as the reviewing court remain just that:  a body tasked with reviewing the lower court's findings using hybrid substantial evidence/abuse of discretion standards. (See *id*. at p. 641, quoting *In re Zeth S.* (2003) 31 Cal.4th 396, 410 ["the hybrid standard we now endorse simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions'"].)

DISPOSITION

The judgment (order terminating parental rights and selecting adoption as the permanent plan) is affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

TANGEMAN, J.

7

Arthur A. Garcia, Judge
Superior Court County of Santa Barbara

_____

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant S.K.

Michael C. Ghizzoni, County Counsel, Lisa A. Rothstein, Senior Deputy County Counsel, for Plaintiff and Respondent Santa Barbara County Department of Social Services.