Filed 1/5/23  In re Lev J. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re LEV J. et al., Persons Coming Under the Juvenile Court Law. | B317753 (Los Angeles County Super. Ct. No. DK05808A, C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.W.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Susan Ser, Judge.  Affirmed.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

L.W. (mother) appeals the juvenile court's order terminating her parental rights over two of her sons—Lev J. and Led J.  Because we conclude that the trial court did not commit any procedural errors and did not abuse its discretion in finding the beneficial parent-child relationship exception inapplicable, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.     Facts

Mother and Antoine J. (father) have two sons—Lev J. (born July 2013) and Led J. (born April 2015).[1]

In June 2014, mother consumed so much alcohol that she became unconscious while caring for Lev.

In the spring and summer of 2015, while Led was a newborn, mother repeatedly tested positive for alcohol.

Both boys suffer from fetal alcohol syndrome and resulting developmental delays due to mother's ingestion of alcohol while

---

1     Mother has a third son, Leo, with Leland S.  However, Leo is not involved in this appeal, so we do not mention him further.

2

pregnant. Lev also has an enlarged heart and mild mental retardation. Led suffers from asthma and has a failure to thrive.

In late August 2015, mother and father got into a physical altercation in which father dragged mother down a flight of stairs by her ankles and repeatedly pushed mother against a table.

## II. Procedural History

### A. *Initial assertion of dependency jurisdiction and first period of reunification services*

In September 2015, the juvenile court exerted dependency jurisdiction over Lev on the ground that mother's consumption of alcohol in June 2014 placed him "in a detrimental and endangering situation" that posed a substantial risk of serious physical harm, thereby warranting jurisdiction under Welfare and Institutions Code section 300, subdivision (b).[2]

In October 2015, the Los Angeles Department of Children and Family Services (the Department) filed a petition asking the juvenile court to assert dependency jurisdiction over infant Led, and concurrently filed a petition under section 342 asking the court to exert dependency jurisdiction over Lev on additional grounds. Both petitions rested on the same allegation—namely, that mother and father's August 2015 incident, along with prior incidents, reflected a history of domestic violence that placed Led and Lev at substantial risk of serious physical harm, thereby warranting jurisdiction under subdivision (b) of section 300. The Department also alleged mother's alcohol abuse as a second basis for dependency jurisdiction over Lev pursuant to subdivision (j) of section 300. The juvenile court sustained both petitions in May 2017, ordered the kids removed from mother's custody, ordered

---

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

mother to complete a case plan of services (including anger management and domestic violence classes), and ordered the Department to provide mother with reunification services necessary to complete her case plan. The court's orders called for mother's visits with the boys to be monitored.

Mother did not complete her case plan. However, mother's visits with the boys were generally positive and the boys developed a "strong bond" with mother.

B. *Termination of reunification services*

In March 2018, the juvenile court terminated reunification services because mother had yet to complete any portion of her case plan, and set the matter for a permanency planning hearing.

During this time, mother was continuing to have monitored visits with the boys. The visits appeared to be positive, although mother would act in a volatile and aggressive manner toward the boys' caregivers.

On December 27, 2018, the boys moved in with the caregiver who still has custody of them now.

In April 2019, mother filed two petitions under section 388 highlighting that mother had completed several additional aspects of her case plan, and seeking (1) placement of the boys in her custody, or, alternatively, (2) reinstatement of reunification services.

In August 2019, the juvenile court denied mother's request to return the boys to her custody but granted mother's request for further reunification services. The court also issued a new case plan for mother requiring her to complete additional classes.

C. *Second period of reunification services*

Mother's visitation during this second reunification started as monitored, but was liberalized to unmonitored visits. Those

visits were generally good.  However, mother conducted some of those unmonitored visits at the maternal aunt's residence, where the maternal aunt's son (the boys' cousin) had previously sexually molested them.  After these unmonitored visits, Led began "act[ing] up" at home and "displaying sexualized behavior."  As a result, mother's visits were returned to monitored visits at locations *other than* the maternal aunt's home.

In December 2020, mother tested positive for alcohol.

At a hearing on December 7, 2020, the juvenile court terminated reunification services for a second time and again set the matter for a permanency planning hearing.

Mother continued to allow the boys to visit maternal aunt's home where they had previously been sexually molested by their cousin in violation of the court's visitation order.

In its reports filed in anticipation of the permanency planning hearing, the Department asked Lev and Led about their views on being adopted by their current caregivers.  Because of their developmental disabilities, neither child fully understood the concept of adoption.  However, both Lev and Led indicated that they were happy living with their current caregivers and would like to live with them permanently.  The Department also reported that each child had a secure attachment and "strong bond" with the caregivers, and that the caregivers were attentive, nurturing, and loving to the boys.  The boys thought of their caregiver's residence as their "home."

Mother's visits with the boys during this period were good.

**D.    *Permanency planning hearing***

The juvenile court conducted the permanency planning hearing on January 5, 2022.  Neither mother nor the Department asked to present any evidence.  Mother's attorney asked "minor's

5

counsel" to set forth "what the children feel about [the] situation." Minor's counsel responded that Led "want[s] to remain living with" his current caregiver and that Lev, because he has "more of a relationship with his mother than Led[]," "would like to remain with [the] current caregivers" if he cannot "be returned back to mother's care." Mother then asked the court to impose a legal guardianship rather than terminate her parental rights under the beneficial parent-child relationship exception because the "bond between . . . mother and her children" "is worth saving."

The juvenile court disagreed. The court reaffirmed the propriety of terminating mother's reunification services by finding that "it would be detrimental to the children to be returned to mother." The court then found that "no exception to adoption applies in this case." Specifically, the court found that mother failed to prove by a preponderance of the evidence that the beneficial parent-child relationship exception applied because that exception required a showing that the parental bond confer "not just a slight benefit, but a significant benefit including a parental role," and mother did not prove that her relationship with the boys "would benefit the child[ren] greatly." The court went on to find that "any benefit to the children from the relationship with [mother] is outweighed by the physical and emotional benefit the children will receive through the permanency and stability of adoption." The court accordingly found that "terminating [mother's] parental rights would [not] be detrimental to [Lev or Led]."

**E.**     *Appeal*

Mother filed a notice of intent to file a writ petition, which we have construed as a notice of appeal.

6

## DISCUSSION

Mother argues that the juvenile court erred in finding that the beneficial parent-child relationship exception did not apply (and, on that basis, in terminating her parental rights).

Once a juvenile court has terminated reunification services, the court "shall terminate parental rights" if it finds, "'by clear and convincing evidence,'" "'that it is likely the [child] will be adopted'" within a reasonable time. (§ 366.26, subds. (a) & (c)(1); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250.) Thus, a juvenile court must terminate parental rights and order adoption unless the parent opposing termination proves that one of six statutory exceptions applies. (§ 366.26, subd. (c)(1) & (c)(1)(B); *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527, overruled in part on other grounds as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010 & fn. 7.)

One of the six exceptions is the beneficial parent-child relationship exception. Because this exception "applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adopted home, would be harmful for the child," a court will find the exception applicable only if the parent "establish[es]" "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 630, 631, 635 (*Caden C.*).) In assessing whether a child would benefit from a continued relationship with the parent, the parent must show "that the child has a substantial, positive, emotional attachment with the parent" in light of several factors, such as "'[(1)] [t]he age of the child, [(2)] the

7

portion of the child's life spent in the parent's custody, [(3)] the "positive" or "negative" effect of interaction between parent and child, and [(4)] the child's particular needs.'" (*Id.* at pp. 632, 636, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) Because this exception merely precludes the termination of parental rights but does not place the child back into the parent's custody, whether the parent would be able to care for the child on her own is not relevant. (*In re D.M.* (2021) 71 Cal.App.5th 261, 269-270 (*D.M.*); *In re J.D.* (2021) 70 Cal.App.5th 833, 864-865 (*J.D.*); *In re B.D.* (2021) 66 Cal.App.5th 1218, 1229-1230 (*B.D.*).) In assessing whether the termination of parental rights would be detrimental to the child "when balanced against the countervailing benefit of a new, adoptive home," a court is to examine "how the child would be affected by losing the parental relationship" entirely. (*Caden C.*, at pp. 633.) This is necessarily a "subtle, case-specific inquiry." (*Ibid.*) We review a juvenile court's findings regarding the first two elements (visitation and relationship) for substantial evidence, and its ruling regarding the third element (balancing of detriment versus benefit) for an abuse of discretion. (*Id.* at pp. 639-641.)

The Department does not dispute that mother had regular visitation and contact with Lev and Led during the seven-plus years that this dependency case has been open. And although the parties dispute whether mother's relationship with the boys has given them a "substantial, positive, emotional attachment" to mother, we need not resolve that dispute because we conclude that the juvenile court did not abuse its discretion in finding that terminating mother's parental rights (and hence all relationship with mother) would not be detrimental to the boys after weighing the degree of the boys' attachment to mother against the benefit

8

of staying with their caregivers.  Although we are assuming mother's relationship with the boys is "substantial, positive, [and] emotional," not all such relationships meeting this threshold are equal (for, if they were, there would be no need for the balancing that occurs in the third step of this exception).  Looking to the factors bearing on the degree of emotional attachment, it is undisputed that the boys have spent more time apart from mother than time with her:  Mother cared for Lev until he was two years and three months old, and cared for Led only for the first six months of his life; Lev is now nine, and Led, seven.  Although the time the boys have spent with mother has had some positive impact, it has also had some negative impacts on the boys:  Mother knowingly put the boys at risk of sexual molestation by allowing them to stay at the maternal aunt's house, Led thereafter starting displaying sexualized behavior, and Lev also evinced "a little rage" after some visits with mother.  In their new, adoptive home, the kids have a "strong bond" with their current caregivers, with whom they have been living for nearly four years (since December 2018) and whose residence they already think of as their "home."  Lev indicated a preference to live with mother over the caregivers, but also indicated he would be happy remaining with the caregivers if living with mother was not an option (and, under a legal guardianship, it is not); Led indicated a preference for living with the caregivers.  The juvenile court was thus faced with assessing whether the detrimental effect of the boys' loss of a relationship with mother outweighed the benefit of being able to be adopted by their current caregiver.  Although different juvenile courts might reasonably come to different conclusions on the facts of this case, we cannot say that the juvenile court here abused its discretion

in finding that the benefits to Lev and Led of being adopted outweighed the loss of their relationship with their mother.

Mother wages both procedural and substantive attacks on the juvenile court's ruling.

Mother makes what boil down to three procedure-focused arguments. First, mother argues that the Department did not comply with its statutory duty, when preparing an assessment report in anticipation of a permanency planning hearing, to set forth "a statement from the child concerning placement and the adoption or legal guardianship" (§ 366.22, subd. (c)(1)(E); see generally, *In re Ashley M.* (2003) 114 Cal.App.4th 1, 7-8 [discussing Department's duty to provide information to the juvenile court]), and that the juvenile court erred in relying on the minors' counsel's representations about the boys' feelings about with whom they would like to live because those representations are not "evidence." This argument lacks merit. The Department's report indicates that the Department asked the boys about adoption, that they did not understand the question, and that the Department then asked them for their preferences about where they would prefer to live. Mother asserts that the Department should have done more, and blames the Department for not explaining why doing more was not feasible; but mother has it backwards, as it is her burden on appeal to show error. The court also did not err in accepting the representations of minors' counsel about the boys' preferences when mother's counsel opted not to present any evidence and specifically asked minors' counsel to relay the boys' preferences. (Cf. § 366.26, subd. (h)(2) [children shall be present to testify only "if the child or the child's counsel so requests or the court so orders"].) Furthermore, mother has provided no basis to believe

10

that the boys *had* an opinion about adoption or that minors' counsel's representations of the boys' preferences were inaccurate.

Second, mother argues that juvenile court did not make any specific findings about the visitation and other elements of the beneficial parent-child relationship exception. This argument is also meritless. There is no "requirement . . . that [a] juvenile court, in finding the [beneficial] parent[-child relationship] exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 (*A.L.*).) And because this element is satisfied in mother's favor, the absence of a finding on this element is of no consequence.

Third, mother argues that the juvenile court considered improper factors when it stated that "it would be detrimental to the children to be returned to mother." Because a juvenile court in considering the beneficial parent-child relationship exception necessarily assumes that the child will remain outside the parents' custody (*Caden C.*, *supra*, 11 Cal.5th at pp. 630-631, 636; *D.M.*, *supra*, 71 Cal.App.5th at pp. 269-270), mother reasons, the court's comment here about whether it would be detrimental for the boys to be returned to mother is improper and warrants reversal and a remand. We disagree. That is because the court in this case also made the express finding that "*terminating [mother's] parental rights* would [not] be detrimental to [Lev or Led]," which is the finding section 366.26, subdivision (c)(1)(B), requires before any exception to the termination of parental rights may be found. To be sure, the court's finding that "it would be detrimental to the children *to be returned to mother*" is duplicative of the finding that the court previously made when it

11

terminated mother's reunification services.  (§ 366.22, subd. (a)(1).)  However, in light of the court's other express findings, the court's superfluous finding does not call into question the court's analysis of the beneficial parent-child exception or its decision not to apply it.

Mother makes three substantive objections to the juvenile court's ruling.  First, she argues that the juvenile court improperly referred to whether she occupied a parental role, a consideration that mother suggests is verboten under *Caden C.*, *supra*, 11 Cal.5th 614.  We reject this argument.  *Caden C.* held that whether a parent occupied a "parental role" is not dispositive of the applicability of the beneficial parent-child relationship, but is still relevant to the strength of the relationship between the parent and child.  (*B.D.*, *supra*, 66 Cal.App.5th at pp. 1228-1231; *J.D.*, *supra*, 70 Cal.App.5th at pp. 864-865; *In re M.G.* (2022) 80 Cal.App.5th 836, 848, 851; *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 210 (*L.A.-O*); *In re Katherine J.* (2022) 75 Cal.App.5th 303, 319-320 (*Katherine J.*); *A.L.*, *supra*, 73 Cal.App.5th at p. 1157.)  The juvenile court's assertion in this case that the exception required a parental bond with "not just a slight benefit, but a significant benefit including a parental role" did not transgress *Caden C.*'s limits because, even though the court's language *could* be read as adopting a "parental role or you lose" rule, the court in this case went on to balance the weight of the boys' relationship with mother, the detriment of losing that relationship on the boys, and whether that detriment was outweighed by the benefits of the boys' adoption by their caregiver.  And even if we assume that the court erred in considering whether mother occupied a parental role in assessing whether mother had a substantial, emotional attachment to the boys, we have assumed the existence

12

of such an attachment on appeal and affirmed the juvenile court's rejection of the exception on the third, balancing element. Thus, any error was not prejudicial.

Second, mother argues that the Department did not prove any connection between mother's ongoing alcohol issues and her relationship to the boys. We also reject this argument. To begin, it is mother who bears the burden of proving the elements of the beneficial parent-child exception; the Department has no burden at all. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 953-954.) Further, *Caden C.* and its progeny make clear that whether a parent has addressed the issues giving rise to dependency jurisdiction is not relevant unto itself, but is relevant to show the positive or negative effect of the parent's relationship on the child and, to a lesser extent, to the balancing of whether termination of that relationship would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 639; *B.D.*, *supra*, 66 Cal.App.5th at p. 1228; *J.D.*, *supra*, 70 Cal.App.5th at p. 864; *L.A.-O*, *supra*, 73 Cal.App.5th at p. 210; *Katherine J.*, *supra*, 75 Cal.App.5th at p. 318; *In re D.M.*, *supra*, 71 Cal.App.5th at pp. 269-270.) Here, we have assumed the relationship element to be met and have examined the juvenile court's balancing of detriment and benefit without reference to that evidence (which would only hurt mother). Thus, the Department's failure to elicit evidence on a factor that is both assumed to exist on appeal and on which it had no burden of proof provides no basis for reversal.

Third, mother argues that there was evidence in the record of a "strong" bond between mother and the boys because she was the one constant in their lives throughout the long history of this case. In so arguing, mother is asking us to reweigh the evidence

13

more favorably to her.  This is not allowed.  (*B.D.*, *supra*, 66 Cal.App.5th at p. 1229.)

## DISPOSITION

The order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, P. J.

LUI


_____,  J.*

BENKE

---

\*      Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.